1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| MARYBETH MOORE, Individually and on Behalf of All Others Similarly Situated, | Case No. |
|---|---|
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| THE IRVINE COMPANY, LLC; REALPAGE, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LINCOLN PROPERTY CO.; CUSHMAN & WAKEFIELD, INC.; FPI MANAGEMENT, INC.; RPM LIVING, LLC; BH MANAGEMENT SERVICES, LLC; MID-AMERICA APARTMENT COMMUNITIES, INC.; MORGAN PROPERTIES, LLC; AVENUE5 RESIDENTIAL, LLC; BOZZUTO MANAGEMENT COMPANY; AVALONBAY COMMUNITIES, INC.; HIGHMARK RESIDENTIAL, LLC; EQUITY RESIDENTIAL; ESSEX PROPERTY TRUST, INC; ZRS MANAGEMENT, LLC; CAMDEN PROPERTY TRUST; UDR, INC.; CONAM MANAGEMENT CORPORATION; CORTLAND PARTNERS, LLC; THRIVE COMMUNITIES MANAGEMENT, LLC; SECURITY PROPERTIES INC.; CWS APARTMENT HOMES, LLC; PROMETHEUS REAL ESTATE GROUP; SARES REGIS GROUP OPERATING, INC.; MISSION ROCK RESIDENTIAL, LLC; and MORGAN GROUP, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 · FAX 206.319.5450
www.terrellmarshall.com

# I. NATURE OF THE ACTION

1. Plaintiff MaryBeth Moore ("Plaintiff") challenges a cartel among lessors of multifamily residential real estate leases ("Lessors") to artificially inflate the prices of multifamily residential real estate in the United States above competitive levels.

2. Until approximately 2016, and potentially earlier, many of the nation's largest Lessors priced their leases based upon their own assessments of how to best compete against other Lessors. Lessors generally priced their units competitively to maximize occupancy (that is, maximizing output). Lessors had an incentive to lower their prices to attract lessees away from their competitors, until all available leases were sold. In this way, competition drove rent levels to reflect available supply of rental units and lessee demand. Lessors also independently determined when to put their leases on the market, resulting in unpredictable supply levels—a natural phenomenon in a competitive market. When supply exceeded demand, Lessors cut prices.

3. As explained by a former industry executive and a primary developer of software at issue in this case, Donald Davidoff, Lessors face "a classic prisoners' dilemma." Since residential real estate is a perishable resource (if a unit sits vacant for a month, a Lessor can never monetize that lost month of rent), Lessors favored a strategy of keeping "heads in the beds," a term for offering sufficiently attractive lease pricing to maximize physical occupancy levels in multifamily residential real estate properties. Thus, Davidoff opined, while all Lessors collectively "would be better off limiting their rent [price] reductions," if any Lessor individually "lower[ed] their rents while the others don't, then that [individual Lessor] would outperform" vis-à-vis their competitors. In the absence of assurances that all Lessors would collectively be limiting their rental price reductions, then, the prisoner's dilemma dictated that the prudent course was to reduce price and compete for market share.

4. However, beginning in approximately 2016, and potentially earlier, Lessors replaced their independent pricing and supply decisions with collusion. Lessors agreed to use a common third party that collected real-time pricing and supply levels, and then used that data to

CLASS ACTION COMPLAINT - 2

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 · FAX 206.319.5450
www.terrellmarshall.com

Case 2:22-cv-00389   Document 1   Filed 12/27/22   Page 2 of 27 · PageID #: 2

1    make unit-specific pricing and supply recommendations.  Lessors also agreed to follow these

2    recommendations, on the expectation that competing Lessors would do the same.

3          5.      That third party is RealPage, Inc. ("RealPage").  RealPage provides software and

4    data analytics to Lessors.  RealPage also serves as the mechanism by which Lessors collude and

5    avoid competition, increasing lease prices to Plaintiff and other members of the proposed Class.

6    RealPage openly boasts that its services "balance supply and demand to maximize [Lessors']

7    revenue growth."  And that is precisely what RealPage has done, facilitating an agreement

8    among participating Lessors not to compete on price, and allowing Lessors to coordinate both

9    pricing and supply through two mutually reinforcing mechanisms in furtherance of their agreed

10   aim of suppressing price competition for multifamily residential real estate leases.

11         6.      First, Lessors "outsource daily pricing and ongoing revenue oversight" to

12   RealPage, replacing separate centers of independent decision-making with one. RealPage

13   collects up-to-the-minute data on the historical and contemporaneous pricing from participating

14   Lessors, data that, according to RealPage, is updated "every time [Lessors] make or change a

15   [lease] renewal offer," spanning over "16 million units," which is a "very large chunk of the total

16   inventory in the country." It standardizes this data to account for differences in the characteristics

17   or "class" of the property in question. RealPage then runs this massive dataset through its pricing

18   algorithm, whereby RealPage set prices for participating Lessors through application of a

19   common formula. RealPage touts that it sets pricing for Lessors' "properties as though we own

20   them ourselves"—i.e., the participating Lessors' cartel replicates the market outcomes one would

21   observe if they were a single seller or monopolist of residential leases.

22         7.      While Lessors are able to reject the RealPage pricing through an onerous process,

23   RealPage emphasizes the need for "discipline" among participating Lessors. To encourage

24   adherence to its common scheme, RealPage explains that for its services to be most effective in

25   increasing rents, Lessors must accept the pricing at least eighty percent of the time. These efforts

26   are successful, with Ryan Kimura, a former RealPage executive, explaining that as many as 90

27   percent (and at least 80 percent) of prices are adopted by participating Lessors.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

8.      Second, RealPage allows participating Lessors to coordinate supply levels to avoid price competition.  In a competitive market, there are periods where supply exceeds demand, and that in turn puts downward pressure on market prices as firms compete to attract lessees.  To avoid the consequences of lawful competition, RealPage provides Lessors with information sufficient to stagger lease renewals to avoid oversupply.  Lessors thus held vacant rental units unoccupied for periods of time (rejecting the historical adage to keep the "heads in the beds") to ensure that, collectively, there is not one period in which the market faces an oversupply of residential real estate properties for lease, keeping prices higher.

9.      By staggering lease renewals to artificially smooth out natural imbalances of supply and demand, RealPage and participating Lessors also eliminate any incentive to undercut or cheat on the cartel (avoiding a race to the bottom, or "prisoner's dilemma").  This is a central mantra of RealPage, to sacrifice "physical" occupancy (i.e., to decrease output) in exchange for "economic" occupancy, a manufactured term RealPage uses to refer to increasing prices and decreasing occupancy (output) in the market.

10.     RealPage's and participating Lessors' coordinated efforts have been effective at driving anticompetitive outcomes: higher prices and lower physical occupancy levels (output). RealPage brags that participating Lessors experience "[r]ental rate improvements, year over year, between 5% and 12% in every market." The CEO of Defendant Lessor Camden, Ric Campo, has touted that the net effect of raising rents and "pushing people out" of the residential real estate leases they could no longer afford, was "$10 million in income." As discussed below, RealPage and participating Lessors have accomplished their goals of ratcheting up prices even under unprecedented market downturns such as the Covid-19 pandemic.

11.     RealPage is proud of its role in the exploding increase in the prices of residential leases.  In a marketing video used to attract additional Lessors to the conspiracy, a RealPage Vice President discussed the recent and never-before seen price increases for residential real estate leases, as high as 14.5% in some markets.  When another RealPage executive asks: "What

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

role has the [RealPage] software played" in those increases, the RealPage Vice President responded: "I think it's driving it, quite honestly."

12.     If left unchecked, RealPage and its participating Lessors' cartel stand to break the multifamily residential real estate lease market and continue to exacerbate the affordable housing crisis facing this Nation. The cartel Plaintiff challenges is unlawful under Section 1 of the Sherman Act. Plaintiff brings this action to recover her damages, trebled, as well as injunctive and other appropriate relief, detailed infra, on behalf of all others similarly situated.

## II.     PARTIES AND UNNAMED CO-CONSPIRATORS

13.     Plaintiff MaryBeth Moore is a citizen and resident of the State of Florida. Ms. Moore rented a multifamily residential unit in a property managed by Lessor Defendant Lincoln Property Co. ("Lincoln") in West Plam Beach, FL beginning in approximately January 2021 and continuing through the present. Ms. Moore has paid higher rental prices directly to a co-conspirator by reason of the violation alleged herein.

14.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas. RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thoma Bravo in a transaction that valued RealPage at approximately $10.2 billion. RealPage provides software and services to the residential real estate industry, including the RMS described herein. RealPage has thousands of employees and earns over a billion dollars per year in revenue. As of December 31, 2019, RealPage had over 29,800 clients, including each of the ten largest multifamily property management companies.

15.     Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability corporation headquartered in Charleston, South Carolina. It is the largest manager of multifamily rental real estate in the United States, with more than 782,900 multifamily units and student beds under management nationally. On information and belief, Greystar earns billions of dollars per year in revenue, controls $35.5 billion dollars in assets, and employs over 20,000 people.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 · FAX 206.319.5450
www.terrellmarshall.com

16.     Lessor Defendant Lincoln is a Texas corporation headquartered in Dallas, Texas. Lincoln is the second largest manager of multifamily rental real estate in the United States, with over 210,000 multifamily units under management nationally. On information and belief, Lincoln earns billions of dollars per year in revenue and employs thousands of people.

17.     Lessor Defendant Cushman & Wakefield, Inc. ("C&W") is a Delaware corporation headquartered in New York, New York. It is the third largest manager of multifamily rental real estate in the United States, with over 172,000 multifamily units under management nationally. On information and belief, C&W earns billions of dollars per year in revenue and employs over ten thousand people.

18.     Lessor Defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California. FPI is the fifth largest manager of multifamily rental real estate in the United States, with over 150,000 multifamily units under management in 17 states. On information and belief, FPI earns billions of dollars per year in revenue and employs thousands of people.

19.     Lessor Defendant RPM Living LLC ("RPM") is a Texas limited liability company headquartered in Austin, Texas. RPM is the seventh largest manager of multifamily rental real estate in the United States, with over 112,000 units under management in 21 states. On information and belief, RPM earns hundreds of millions of dollars per year and employs hundreds of people.

20.     Lessor Defendant BH Management Services, LLC ("BH") is an Iowa limited liability company with its headquarters in Des Moines, Iowa. BH is the eighth largest manager of multifamily rental real estate in the United States, with over 100,000 multifamily units under management in 28 states. On information and belief, BH earns over one billion dollars per year in revenue and employs over 2,000 people.

21.     Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA") is a Tennessee corporation headquartered in Germantown, Tennessee. MAA is the tenth largest manager of multifamily rental real estate in the United States, with over 100,000 multifamily

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

units under management in 16 states. On information and belief, MAA earns over one billion dollars per year in revenue and employs over 2,400 people.

22.     Lessor Defendant Morgan Properties, LLC ("Morgan Properties") is a Pennsylvania limited liability company headquartered in King of Prussia, Pennsylvania. Morgan is the eleventh largest manager of multifamily rental real estate in the United States, with over 96,000 multifamily units under management in 20 states. On information and belief, Morgan earns hundreds of millions of dollars per year in revenue and employs hundreds of employees.

23.     Lessor Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware limited liability company headquartered in Seattle, Washington. Avenue5 is the twelfth largest manager of multifamily rental real estate in the United States, with over 96,900 multifamily units under management in 12 states. On information and belief, Avenue5 earns over $500 million dollars per year in revenue and employs over 1,000 people.

24.     Lessor Defendant Bozzuto Management Company ("Bozzuto") is a Maryland company headquartered in Greenbelt, Maryland. Bozzuto is the thirteenth largest manager of multifamily rental real estate in the United States with over 80,000 multifamily units under management in 12 states. On information and belief, Bozzuto earns over two billion dollars per year in revenue and employs over 3,000 people.

25.     Lessor Defendant AvalonBay Communities, Inc. ("AvalonBay") is a Maryland corporation headquartered in Arlington, Virginia. AvalonBay is the fourteenth largest manager of multifamily rental real estate in the United States, with over 88,000 units under management in twelve states. On information and belief, AvalonBay earns billions of dollars per year in revenue and employs thousands of people.

26.     Lessor Defendant Highmark Residential, LLC ("Highmark") is a Delaware limited liability company headquartered in Dallas, Texas. Highmark is the fifteenth largest manager of multifamily rental real estate in the United States, with over 79,000 units in 15 states. On information and belief, Highmark earns hundreds of millions of dollars per year in revenue and employs over 1,500 people.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

27.     Lessor Defendant Equity Residential ("Equity") is a Maryland real estate investment trust headquartered in Chicago, Illinois. Equity is the sixteenth largest manager of multifamily rental real estate in the United States, with over 80,000 units under management in 8 states. On information and belief, Equity earns over 2 billion dollars per year in revenue and employs over 2,000 people.

28.     Lessor Defendant The Irvine Company, LLC ("Irvine") is a Delaware limited liability corporation headquartered in Newport Beach, California. Irvine is the twenty-third largest manager of multifamily real estate in the United States, with over 63,000 units under management in 5 states. On information and belief, Irvine earns millions of dollars per year in revenue and employs over 1,000 people.

29.     Lessor Defendant Essex Property Trust, Inc. ("Essex") is a Maryland corporation headquartered in San Mateo, California. Equity is the twenty-fourth largest manager of multifamily rental real estate in the United States, with over 61,000 units under management in California and Washington. On information and belief, Essex earns over 1.4 billion dollars per year in revenue and employs over 1,700 people.

30.     Lessor Defendant ZRS Management, LLC ("ZRS") is a Florida limited liability company headquartered in Orlando, Florida. ZRS is the twenty-seventh largest manager of multifamily rental real estate in the United States, with over 60,000 units under management in 6 states. On information and belief, ZRS earns millions of dollars per year in revenue and employs hundreds of people.

31.     Lessor Defendant Camden Property Trust ("Camden") ("Camden") is a Texas real estate trust headquartered in Houston, Texas. Camden is the twenty-ninth largest manager of multifamily rental real estate in the United States, with over 58,000 units under management. On information and belief, Camden earns over one billion dollars per year in revenue and employs over 1,000 people.

32.     Lessor Defendant UDR, Inc. ("UDR") is a Maryland corporation headquartered in Highlands Ranch, Colorado. UDR is the thirtieth largest manager of multifamily rental real

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

estate in the United States, with over 55,000 units under management. On information and belief, UDR earns over one billion dollars per year in revenue and employs over 1,000 people.

33. Lessor Defendant CONAM Management Corporation ("CONAM") is a California corporation headquartered in San Diego, California. CONAM is the thirty-third largest manager of multifamily rental real estate in the United States, with over 51,000 units under management. On information and belief, CONAM earns hundreds of millions of dollars per year in revenue and employs over 1,000 people.

34. Lessor Defendant Cortland Partners, LLC ("Cortland") is a Georgia limited liability company headquartered in Atlanta, Georgia. Cortland has over 85,000 units under management in 13 states. On information and belief, Cortland earns hundreds of millions of dollars in revenues per year and over 1,000 people.

35. Lessor Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington. Thrive has over 18,000 units under management in the greater Pacific Northwest. On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people.

36. Lessor Defendant Security Properties Inc. ("Security Properties") is a Washington corporation headquartered in Seattle, Washington. Security Properties has over 22,000 units under management in 18 states. On information and belief, Security Properties earns millions of dollars per year in revenue.

37. Lessor Defendant CWS Apartment Homes, LLC ("CWS") is a Delaware limited liability company headquartered in Austin, Texas. CWS has over 29,000 units under management. On information and belief, CWS earns millions of dollars per year in revenue and employs over 500 people.

38. Lessor Defendant Prometheus Real Estate Group ("Prometheus") is a California corporation headquartered in San Mateo, California. Prometheus has over 12,000 multifamily units under management in California, Oregon, and Washington. On information and belief, Prometheus earns millions of dollars per year in revenue and employs hundreds of people.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 · FAX 206.319.5450
www.terrellmarshall.com

1     39.    Lessor Defendant Sares Regis Group Operating, Inc. ("Sares Regis") is a

California corporation headquartered in Newport Beach, California. Sares Regis has over 29,000

units under management. On information and belief, Sares Regis earns millions of dollars in

revenue per year and employs hundreds of people.

40.    Lessor Defendant Mission Rock Residential, LLC ("Mission Rock") is a

Delaware limited liability company headquartered in Denver, Colorado. Mission Rock has over

29,000 units under management in 17 states. On information and belief, Mission Rock earns tens

of millions of dollars per year in revenue and employs over 700 people.

41.    Lessor Defendant Morgan Group Inc. ("Morgan Group") is a Delaware

corporation headquartered in Houston, Texas. Morgan Group has over 15,000 units under

management in 5 states. On information and belief, Morgan earns millions of dollars per year in

revenue and employs hundreds of employees.

42.    The Lessor Co-Conspirators are various persons and entities, including Lessors

and other industry participants, known and unknown to Plaintiff and not named as defendants in

this action, who have participated as co-conspirators with RealPage and the Lessor Defendants in

the offenses alleged and have performed acts and made statements in furtherance of the cartel.

### III.    JURISDICTION AND VENUE

43.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and

Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

44.    This Court has personal jurisdiction over Defendants under Section 12 of the

Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and California's long-

arm statute, Cal. Code Civ. Proc. § 410.10.

45.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents,

or affiliates, may be found in and transact business in the forum state, including the sale of

multifamily residential real estate leases.

CLASS ACTION COMPLAINT - 10

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Case 2:23-cv-00389   Document 1   Filed 12/27/22   Page 10 of 27   PageID #: 10

46.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

47.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.     FACTUAL BACKGROUND

### A.     The Market for Multifamily Residential Real Estate Leases

48.     The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is the United States.

49.     From the perspective of the consumer, multifamily rental apartment units are not an economic substitute for apartments, condominiums, or homes for purchase because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.

50.     Additionally, from the perspective of the consumer, single-family real estate is not an economic substitute for multifamily residential real estate.  For example, single-family properties typically do not offer amenities and security.  Indeed, industry participants in the multifamily residential real estate market typically distinguish between multifamily and single-family real estate when discussing customer preferences and market trends, including concerning their disparate respective pricing.

51.     The multifamily residential real estate lease market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  causing a sufficient number of customers to switch to other products or services such that the

2  SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is

3  properly defined.  If the SSNIP is not profitable, the market is too narrowly defined, and does not

4  encompass sufficient economic substitutes.

5  52.  Here, the SSNIP test is satisfied, and the market is properly defined.  As described

6  above and below, pursuant to the Lessors' agreement not to compete on price, Lessors are able to

7  increase "year over year, between 5% and 12% in every market," yet those increases have not

8  driven enough renters out of the market such that the SSNIP has become unprofitable to Lessors.

9  **B.  Historical Pricing in the Market for Multifamily Residential Real Estate Leases**

10  53.  Before RealPage facilitated collusion among Lessors, Lessors acting

11  independently followed a policy to keep "heads in the beds."  In simplest terms, this meant the

12  market was functioning competitively.  Lessors, concerned that every day a property remained

13  unrented was a lost opportunity to earn revenue for that day, offered sufficiently attractive

14  pricing to maintain maximum "physical occupancy" across their units.  This could come in the

15  form of reduced prices—often termed concessions—such as "first month free."

16  54.  The "heads in the beds" strategy also minimized turnover expenses, as there were

17  hard costs associated with finding and evaluating a replacement tenant as well as lost revenue

18  opportunities if the unit sat vacant between tenants.

19  55.  The senior vice president of property management at Defendant Lessor the

20  Morgan Group, David Hannan, described the market before RealPage's arrival, stating that a

21  "generation" of Lessors "grew up worshipping the occupancy gods. We learned that if you were

22  not 95 percent-plus occupied, the asset was failing." Prior to 2016, Lessors accomplished their

23  goals of "worshipping the occupancy gods" and "keeping heads in the beds" through "manual

24  pricing," a term Lessors use to refer to uncoordinated, independent pricing.  This led Lessors to

25  maximize physical occupancy levels (output) by offering sufficiently low pricing to attract

26  tenants to sign or renew existing leases.  In economics, this is referred to as a market share over

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

price strategy, and it is a common defining characteristic of a market that is functioning competitively.

**C.    The Lessor Defendants' Outsource Price and Supply Decisions to a Common Decision Maker—RealPage—Which Eliminated Competition**

56.    Following RealPage's entry, RealPage's participating Lessors swiftly, and concertedly, shifted from the previous competitive market share over price strategy to a new collusive price over volume strategy.  Price over volume is a hallmark of pricing in a cartelized market.

57.    RealPage and participating Lessors have adopted a philosophy of economic occupancy, which is a term RealPage uses to refer to the practice of increasing prices notwithstanding market conditions and tolerating any reduced physical occupancy that might engender.  Since Lessors of residential multifamily real estate properties (a finite resource) face a natural prisoner's dilemma, maximizing economic occupancy is only in a firm's economic self-interest if many Lessors collectively follow suit.  As Davidoff—a primary developer of what is now RealPage's revenue management software—stated, while all Lessors "would be better off limiting their rent [price] reductions," if any Lessor "lower[ed] their rents while the others don't, than that [Lessor] would outperform."  The easiest way to solve the prisoner's dilemma, such that it would be profit maximizing to maintain high prices, would be if Lessors had mutual assurances that other Lessors would not compete with them on price.

58.    RealPage and participating Lessors have provided one another with such mutual assurances, agreeing among themselves not to compete on price for multifamily residential real estate leases. They have effectuated their agreement through two mutually reinforcing mechanisms. First, participating Lessors have agreed to set prices using RealPage's coordinated algorithmic pricing. Second, participating Lessors have agreed to stagger their lease renewal dates through RealPage, to avoid (otherwise natural) oversupplies in rental properties.

59.    RealPage's coordinated algorithmic pricing allows participating Lessors, in RealPage's words, to "outsource [their] daily pricing and ongoing revenue oversight" to

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

CLASS ACTION COMPLAINT - 13

RealPage, with RealPage pricing participating Lessors' "properties as if we [RealPage] own them ourselves"—that is, as if RealPage and its participating Lessors were operating as a monopolist.

60. Participating Lessors agree to adhere to RealPage's coordinated algorithmic pricing, often referring to such adherence as pricing "courage" or more frequently, pricing "discipline."

61. Participating Lessors also agree to provide RealPage with real-time access to their competitively sensitive and nonpublic data on their multifamily residential real estate leases.

62. This data, according to RealPage, spans over "16 million units," which is a "very large chunk of the total inventory in the country." RealPage standardizes this data to account for differences in the characteristics or "class" of the property in question. RealPage then runs this massive dataset through its pricing algorithm, whereby RealPage sets prices for participating Lessors through application of a common formula to a common dataset.

63. A RealPage employee reported that these instructions are successful, with as many as 90% (and at least 80%) of RealPage pricing being adopted. As one Lessor explained, RealPage's coordinated algorithmic pricing required counterintuitive changes in their business practices "because[, upon adopting RealPage's coordination of pricing,] we weren't offering concessions nor were we able to negotiate pricing" like they previously had. That Lessor went on to explain that RealPage "maximize[s] rents but you have to be willing to strictly follow it," and, as a result, "we rarely make any overrides to the recommendations" provided by RealPage. Another Lessor described RealPage as bringing "discipline" and "courage to pricing."

64. Using software it designed, applied to the dataset participating Lessors agreed to provide it, RealPage also allows participating Lessors to stagger their lease renewals to avoid natural periods of oversupply that would persist absent concerted action by would-be rival Lessors.

65. A representative of Lessor ECI Group, Emily Mask, explained that, using RealPage, Lessors are "now able to stagger lease expirations throughout the month, effectively

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

cutting down on frictional vacancy loss as well as concessions" on price. That Lessor continued that by staggering lease renewals, Lessors have "leveled the lease expirations throughout the year to better match the historical demand for each community, thus positioning us [Lessors] for even higher rent growth."

66.     Lessors have publicly admitted that RealPage has allowed them to maintain higher prices in concert, with confidence that they can avoid price cutting and the prisoner's dilemma.

67.     One representative of Lessor ECI Group, Mask, commented that while "we [Lessors] are all technically competitors," that Lessors' common adoption of and adherence to RealPage's software "helps us [Lessors] work together," "to work with a community in pricing strategies, not to work separately."

68.     Other Lessors' comments echo the potency and efficacy of their concerted action.

69.     In promotional materials, Defendant Lessor BH reported that RealPage "has given a substantial boost to economic occupancy (the proportion of gross potential rent actually realized vs. physical occupancy, the proportion of units occupied by tenants)," which is to say it caused higher prices and less output.

70.     Another representative from a Lessor, Senior Vice President of Asset Management at LaSalle Investment Management, Stephen Adams, explained that by "outsourcing" pricing functions to RealPage, prices are set by RealPage's "multifamily experts," "who essentially act like an extension of our team."

71.     And Campo, CEO of Defendant Lessor Camden, explained that in following the price over volume, or maximizing economic capacity, strategy, they found "that driving our turnover rate up actually captured additional revenue." Campo continued: "The net effect of driving revenue and pushing people out was $10 million in income." He concluded, "I think that shows that keeping the heads in the beds above all else is not always the best strategy." But given the prisoner's dilemma faced by Lessors, rejecting that competitive strategy is only in a Lessor's economic self-interest if they have assurances that they will not be significantly

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

undercut by a rival. RealPage provides a mechanism through which Lessors reach a common understanding, coordinate their prices, and effectuate that understanding.

72. RealPage, in response to this lawsuit, has defended its conduct by claiming that "typically" Lessors engaged in "manual pricing" (a term of art RealPage uses for any pricing that is not recommended by revenue management systems) by conducting phone surveys to check competitors' rents, which RealPage has claimed publicly could result in anticompetitive behavior. RealPage claims that its offerings thus "help eliminate the risk of collusion that could occur with manual pricing" and the Lessor-to-Lessor communication RealPage claims would occur. But that Lessor-to-Lessor communication on pricing is not proscribed by RealPage, it is encouraged by RealPage, despite RealPage itself recognizing its collusive nature.

**D.    The Lessor Defendants and RealPage Have Inflated the Prices and Reduced the Occupancy (i.e., Output) of Residential Real Estate Leases**

73. As industry participants including RealPage's own executives admit, RealPage's coordinated algorithmic pricing has caused anticompetitive effects in the form of higher prices and reduced output. As just one such example, RealPage's Vice President of Investor Markets, Andrew Bowen, has publicly conceded that: "I think it's [RealPage's coordinated algorithmic pricing] driving it [higher prices for residential real estate leases], quite honestly."

74. RealPage advertises that the Lessors that participate in this cartel experience "[r]ental rate improvements, year over year, between 5% to 12% in every market," the ability to "outperform the market by up to 5%," and "drive up to an additional 150-200 basis points of hidden yield" that would not otherwise be attainable to a Lessor utilizing independent pricing, rather than coordinated pricing. RealPage refers to independent, competitive pricing as "manual pricing." RealPage claims to "outperform manual pricing" by 7 percent each year. That is, the Lessors' collusion succeeds in increasing prices above competitive levels by 7 percent each year.

75. To conclude that these price increases would be economically irrational and against each Lessors' independent economic self-interest if acting alone (that is, absent assurances that other Lessors would also be exercising pricing "discipline"), or that price

CLASS ACTION COMPLAINT - 16

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Case 2:23-cv-00339    Document 1    Filed 12/27/22    Page 16 of 27 · PageID #: 16

increases would be unachievable absent the implementation of coordinated algorithmic pricing by RealPage's participating Lessors, one need look no further than the admissions of RealPage and Lessors, who openly extol the value of cartelization (higher prices, lower output) to each other.

76. In a testimonial video on RealPage's website, the Director of Revenue Management at Lessor JVM Realty, Kortney Balas, explained, "the beauty of using [RealPage's pricing] is that it pushes [Lessors] to go places that you wouldn't have gone on your own if you weren't using it."

77. The CEO of Defendant Equity, David Neithercut, told panelists at an industry conference that it "raised rents hundreds of dollars," following RealPage's pricing, and noting that the Lessor would not have had "the courage to push [rents] as aggressively as [the RealPage pricing] program has."

78. President and COO of Camden, Keith Oden, admitted that, in the natural state of play, it simply is "not in [a Lessor's] DNA to raise pricing $150 to $200 per unit on a lease turn," but following RealPage's coordinated algorithmic pricing allowed the Lessor to do what, independently, it would not.

79. And Kip Zacharias, who worked at Camden as a consultant, observed that the Lessor was able to raise rents in situations where market conditions dictated otherwise, conceding that "[i]f you'd listened to your gut," and not RealPage's pricing, then "you would have lowered your price."

80. And yet another Lessor representative—Jamie Teabo, Senior Vice President for Management at Post Properties—noted that, "[i]n our Florida markets, we let the system push as hard as it would go, and we saw increases as high as 20 percent. . . . Left to our own devices, I can assure you we would have never pushed rents that hard. That was a big number."

81. RealPage itself concedes that these price levels could not be obtained independently, stating: "We believe in overseeing properties as though we own them ourselves. We believe we can deliver better results for you than you would otherwise be able to achieve." In

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

plain terms, RealPage concedes that its coordinated algorithmic pricing allows Lessors to obtain

the same results as a single seller or monopolist—an outcome Lessors "would not otherwise be

able to achieve" without RealPage's pricing and assurances of Lessors' discipline to that pricing.

82.     The Covid-19 pandemic is a prime illustration of Lessors' ability to coordinate

pricing through RealPage and achieve market outcomes untethered to what one would expect if

Lessors were acting independently of one another. A RealPage Vice President of Revenue

Management, Amy Dreyfus, explained that "at the start of Covid, I think a lot of our [Lessors']

initial reaction, was, 'oh I need to start dropping rent, I need to start giving [price] concessions'"

to account for the exodus of renters from major metropolitan areas. But "our [RealPage's]

advisory team and the product did a great job" of resisting that natural competitive outcome.

RealPage's Vice President of Asset Optimization and Deputy Chief Economist, Jay Parsons,

agreed with that assessment, noting "we just saw unbelievable resilience and I would say

discipline in pricing through the worst of the downturns . . . a lot of people thought we'd see

severe rent cuts; that just didn't happen." That "resilience" and "discipline" is "unbelievable"

precisely because absent assurances that competitor Lessors are not going to undercut a given

Lessor on price, such discipline is against the Lessor's individual economic self-interest.

83.     RealPage has undertaken this conduct with full and complete knowledge of its

illegality. One of RealPage's pricing software's main architects, Jeffery Roper, is acutely

familiar with the anticompetitive nature of coordinated algorithmic pricing within an industry.

Before pioneering RealPage's software, Roper was Alaska Airlines' Director of Revenue

Management when it and other airlines began using common software to share nonpublic

planned routes and prices with each other, with the aim of heading off price wars. The

Department of Justice's Antitrust Division ("DOJ") reached settlements or consent decrees for

price fixing violations with eight airlines, including Alaska Airlines. Roper—who had his

computer and documents seized by federal agents—relayed about that experience that, "We all

got called up before the Department of Justice in the early 1980s because we were colluding."

He adds that at the time, "We had no idea" that conduct was unlawful. Having now brought

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

analogous coordinated algorithmic pricing to multifamily residential real estate leasing after the DOJ's airline settlements, however, Roper can no longer claim ignorance of the unlawful nature of this conduct.

**E.    "Plus Factors" Render the Market for Multifamily Residential Real Estate Leases Susceptible to the Formation, Maintenance, and Efficacy of a Cartel**

84.     The market for the sale of multifamily residential real estate leases from Lessors to lessees is characterized by numerous features, referred to as "plus factors," that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.

85.     First, multifamily residential real estate properties owners and operators face significant entry barriers. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small multifamily rental properties cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire. Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

86.     Second, lessees of multifamily residential real estate properties face high exit barriers. Renters typically incur substantial cost and inconvenience when moving, and where price escalation is occurring in broad geographic areas, they might not have a lower priced option in reasonable proximity to where they currently live or work. As such, lessees cannot easily turn to alternative Lessors of multifamily residential real estate properties to discipline cartel pricing.

87.     Third, the demand for multifamily residential real estate property leases is relatively inelastic. The only realistic alternative to renting is buying, and for most renters, that is

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

not an option financially or logistically. Thus, no reasonable substitutes exist to discipline cartel pricing.

88.     Fourth, the market for residential real estate property leases is highly concentrated. Most major metropolitan areas are dominated by relatively few sellers, with many large corporations like Greystar having substantial presences in metropolitan areas throughout the United States.

89.     Fifth, multifamily residential real estate properties are relatively fungible, particularly within classes of properties. That is, when controlling for certain high-level characteristics of properties—such as the number of bedrooms and bathrooms, amenities, location, or the age of the building—properties within those classes are relatively fungible. Lessors have explained that RealPage's pricing software "is correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."

90.     Sixth, RealPage's participating Lessors, directly and using RealPage as a conduit, share competitively sensitive information with one another. In addition to its price-setting and lease renewal-staggering services, RealPage collects non-public data on multifamily residential real estate properties and creates benchmarking reports that allow for quick comparisons of a Lessor's performance on occupancy and price for similar property classes vis-à-vis the industry. This function could not be recreated using any public, non-competitively sensitive sources as the advertised rates for residential real estate leases typically diverge from the actual rates.

91.     Seventh, RealPage and participating Lessors have ample opportunities to collude. RealPage and participating Lessors routinely interact with one another, share information, and collaborate on the development of RealPage's price setting mechanisms behind closed doors.

92.     As just one example, RealPage operates a private RealPage User Group Forum, an association of some thousand participating Lessors, which, according to RealPage, aims "to improve communications between RealPage and the user [Lessor] community," while "promot[ing] communication between users [Lessors]" themselves. Within that Forum is an

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 · FAX 206.350.3528
www.terrellmarshall.com

"Idea Exchange," where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as provide comments on proposed changes that RealPage is considering implementing to its software offerings.

93.     RealPage also organizes a marquee annual, multi-day event called "RealWorld," where Lessors gather along with approved partners and executives from RealPage to network, exchange insights into key initiatives in the industry, and learn best practices for using RealPage tools.  Over the past five years, those conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the Covid-19 pandemic.

94.     And RealPage has invited Lessors to attend periodic "summits" to discuss RealPage's pricing software with RealPage and with one another, covering topics including (1) "Competitive Rent Analysis" or "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing," (2) "Supply Forecasts" and "Demand Forecasts," as well as (3) RealPage's "Pricing Engine," or "[m]ethods to price units in real time based on statistically validated price elasticity models."

95.     Finally, industry trade associations offer RealPage and participating Lessors additional opportunities to conspire. As an illustrative example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas, NV, and Washington, DC. NMHC counts among its "Chair's Circle Sponsors" RealPage, Greystar, and more participating Lessors. Of note, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals."

96.     Nearly fifty additional national and regional trade associations (or their local chapters) serve as conduits of the cartel, in the same way as NMHC by providing venues for RealPage and its participating Lessors to further their cartel's goals.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

97.     National industry trade associations include: (1) Institute of Real Estate Management, (2) National Apartment Association, (3) National Association of Residential Property Managers, (4) Pension and Real Estate Association, and (5) Urban Land Institute.

98.     Regional associations and chapters include: (1) Apartment Association of Greater Dallas, (2) Apartment Association of Greater Orlando, (3) Apartment Association of Greater Los Angeles, (4) Apartment Association of Metro Denver, (5) Apartment Association of Orange County, (6) Apartment Association of Southeast Texas, (7) Apartment Owners Association of California, Inc., (8) Arizona Multihousing Association, (9) Atlanta Apartment Association, (10) Austin Apartment Association, (11) Bay Area Apartment Association, (12) Berkeley Property Owners Association, (13) California Apartment Association, (14) California Business Properties Association, (15) California Landlord Association, (16) California Rental Housing Association, (17) Chicagoland Apartment Association, (18) Colorado Apartment Association, (19) East Bay Rental Housing Association, (20) Florida Apartment Association, (21) Georgia Apartment Association, (22) Houston Apartment Association, (23) Illinois Rental Property Owners Association, (24) Maryland Multi-Housing Association, (25) Massachusetts Apartment Association, (26) Miami Dade Real Estate Investors Association, (27) Mid-Atlantic Real Estate Investors Association, (28) Nevada State Apartment Association, (29) Nor Cal Rental Property Association, (30) North Central Florida Apartment Association, (31) Northwest Florida Apartment Association, (32) Oregon Apartment Association, (33) Oregon Rental Housing Association, (34) Portland Area Rental Owners Association, (35) Rental Housing Association of Washington, (36) San Antonio Apartment Association, (37) San Francisco Apartment Association, (38) South Coast Apartment Association, (39) South East Florida Apartment Association, (40) Southern California Rental Housing Association, (41) Southwest Florida Apartment Association, (42) Texas Apartment Association, (43) Washington Multi-Family Housing Association, and (44) Washington Landlord Association.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**F. Congress Has Requested An FTC Investigation Into Realpage's Practices**

99.     Last month, Senator Sherrod Brown of Ohio and seventeen members of the U.S. House of Representatives wrote letters urging the Federal Trade Commission ("FTC") to investigate Defendant RealPage for the anticompetitive practices alleged in this Complaint.

100.     On November 1, 2022, Senator Brown wrote to FTC Chair Lina Khan urging an investigation into Realpage's use of price optimization software to set rents. He expressed concern that "the collection and use of rent data in price optimization software is allowing for anticompetitive and potentially unlawful collusion among competitors at the expense of consumers." Senator Brown noted that in 2017, RealPage acquired its main competitor, the Rainmaker Group—including its Lease Rent Options ("LRO") software—for $300 million, making RealPage the "dominant provider" of rent-setting software. He pointed to the nation's ongoing housing shortage, and flagged that Realpage's practice of "intentionally holding units vacant, when there are so few homes available, decreases a consumer's negotiating power and exacerbates the housing shortage." While "[f]or property managers and landlords, one of the most appealing aspects of this software is its access to competitor rent data," RealPage's collection of that data enables it to facilitate collusion among competitors. Senators Amy Klobuchar, Richard Durbin and Cory Booker sent a similar letter to Assistant Attorney General Jonathan Kanter, head of the DOJ's Antitrust Division, on November 4, 2022. In particular, the senators stated that they "are concerned about potential anticompetitive coordination taking place through the RealPage User Group."

101.     On November 14, 2022, Representatives Jesus G. "Chuy" Garcia, Jan Schakowsky, Pramila Jayapal, Cori Bush, David N. Cicilline, Katie Porter, Eleanor Holmes Norton, Alexandria Ocasio-Cortez, Mark Takano, Madeleine Dean, Frederica S. Wilson, Jamaal Bowman, Raul M. Grijalva, Mary Gay Scanlon, Dwight Evans, Yvette D. Clarke, and Danny K. Davis (together, the "House Members") similarly urged Chair Khan and Assistant Attorney General Kanter to launch an investigation into Defendant RealPage. The House Members expressed concern that, following Realpage's acquisition of LRO, RealPage controls pricing on

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1 "just under 40 percent of all rental units in the country," including a "high concentration of rental

2 propert[ies] in cities across the country." The letter warned that RealPage collects competitively

3 sensitive data such as "private information on what nearby competitors charge," and if

4 "RealPage and its client landlords are coordinating supracompetitive rental rates, they are

5 responsible for driving up rent in markets across the United States." Indeed, the House Members

6 cite recent reporting that "RealPage clients regularly charge above-market rental rates," at a time

7 when "[r]ent inflation is . . . a major driver of overall inflation," leading to a "rental affordability

8 crisis" that is "increasingly dire for Americans."

9      102.    As of November 23, 2022, the DOJ's Antitrust Division has reportedly opened an

10 investigation into Defendant RealPage for the anticompetitive practices alleged in this

11 Complaint.

12              **V.     CLASS ACTION ALLEGATIONS**

13      103.    Plaintiff brings this action on behalf of themselves and all others similarly situated

14 pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class,

15 which is defined as follows:

16
17         All persons and entities in the United States and its territories that
           are direct purchasers of multifamily residential real estate leases
18         from a Lessor participating in RealPage's pricing software and/or
           lease renewal staggering software programs, or from a division,
19         subsidiary, predecessor, agent, or affiliate of such Lessor, at any
           time during the period of October 18, 2018 until the Defendants'
20         unlawful conduct and its anticompetitive effects cease to persist.[1]

21      104.    The Class is so numerous that joinder of all members in this action is

22 impracticable. There are tens of thousands if not hundreds of thousands of members in the

23 proposed Class.

24      105.    Plaintiff's claims are typical of those of the Class.

25

26

27 _____
[1] Federal and state government entities are excluded from the Class.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    106.    Plaintiff and all members of the Class were all injured by the same unlawful

2    conduct, which resulted in all of them paying more for multifamily residential leases than they

3    otherwise would have in a competitive market.

4    107.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

5    The interests of the Plaintiff are not antagonistic to the Class.

6    108.    Questions of law and fact common to the members of the Class will predominate

7    over questions, if any, that may be individual to individual class members, since the Defendants

8    have acted and refused to act on grounds generally applicable to the Class.

9    Questions of law and fact common to the Class include:

10          a.    Whether Defendants have entered into a formal or informal
                  contract, combination, conspiracy, or common understanding to
11                artificially inflate price and/or artificially suppress supply of
                  multifamily residential real estate leases from competitive levels;
12

13          b.    If Defendants entered into such a formal or informal contract,
                  combination, conspiracy, or common understanding, whether that conduct
14                violates Section 1 of the Sherman Act under the *per se*, quick look, or rule
                  of reason modes of analysis;
15

16          c.    If Defendants entered into such a formal or informal contract,
                  combination, conspiracy, or common understanding, whether that conduct
17                has in fact artificially inflated price and/or artificially suppressed supply of
                  multifamily residential real estate leases from competitive levels;
18

19          d.    The proper measure of damages; and

20          e.    The contours of appropriate injunctive relief to remediate the
                  anticompetitive effects of the challenged conduct in the future.

21    109.    Plaintiff is represented by counsel who are experienced and competent in the

22    prosecution of complex antitrust and unfair competition class actions.

23    110.    Class action treatment is the superior method for the fair and efficient

24    adjudication of the controversy in that, among other things, such treatment will permit a large

25    number of similarly situated persons or entities to prosecute their common claims in a single

26    forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense

27    that numerous individual actions would engender. The benefits of proceeding through the class

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1 | mechanism, including providing injured persons or entities with a method of obtaining redress

2 | for claims that might not be practicable for them to pursue individually, substantially outweigh

3 | any difficulties that may arise in the management of this class action.

### VI.     COUNT ONE
### AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF
### SECTION 1 OF THE SHERMAN ACT

111.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

112.    Defendants have formed a cartel to artificially inflate the price of and artificially

decrease the supply and output of multifamily residential real estate leases from competitive

levels.

113.    The Defendants' cartel has caused the Class to suffer overcharge damages.

114.    There are no procompetitive justifications for the Defendants' cartel, and any

proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

115.    The Defendants' cartel is unlawful under a per se mode of analysis. In the

alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of

analysis.

### VII.    PETITION FOR RELIEF

Plaintiff petitions for the following relief:

A.    A determination that this action may be maintained as a class action pursuant to

Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that

Plaintiff's counsel be appointed as class counsel.

B.    A determination that the conduct set forth herein is unlawful under Section 1 of

the Sherman Act under either a *per se*, quick look, or rule of reason mode of analysis.

C.    A judgment enjoining Defendants from engaging in further unlawful conduct.

D.    An award of attorneys' fees and costs.

E.    An award of pre- and post-judgment interest on all amounts awarded; and

F.    Such other relief as the Court deems just and equitable.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 · FAX 206.319.5450
www.terrellmarshall.com

## VIII. REQUEST FOR A JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 27th day of December, 2022.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, WSBA #26759
    Beth E. Terrell, WSBA #26759
    Email: bterrell@terrellmarshall.com
    Blythe H. Chandler, WSBA #43387
    Email: bchandler@terrellmarshall.com
    936 North 34th Street, Suite 300
    Seattle, Washington 98103
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450

    David B. Rochelson, *Pro Hac Vice Forthcoming*
    Email: drochelson@garwingerstein.com
    Deborah Elman, *Pro Hac Vice Forthcoming*
    Email: delman@garwingerstein.com
    GARWIN GERSTEIN & FISHER LLP
    88 Pine Street, 10th Floor
    New York, New York 10005
    Telephone: (212) 398-0055

    *Attorneys for Plaintiffs*

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com